UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| GORDON B. DEMPSEY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | District Court Cause No. |
| | ) | 1:04-cv-1308-JDT-TAB |
| GEORGE C. CARTER and OLEVA GAY CARTER, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| GORDON B. DEMPSEY, | ) | Bankruptcy Court Cause No. |
| | ) | 02-18007 |
| Debtor. | ) | |

**ENTRY ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT**[1]


**I.      BACKGROUND AND INTRODUCTION**


This matter is before the court on appeal from the United States Bankruptcy

Court by Debtor Gordon B. Dempsey.  Actually, Mr. Dempsey filed several appeals to

this court from his Chapter 13 bankruptcy matter in that court, all of which have been

consolidated into this single proceeding.  A brief synopsis of how these matters came to

_____

[1] This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

this court will provide some context and flavor for understanding the issues to be discussed below.

This saga began in August of 1999 when Mr. Dempsey entered a land contract with George and Oleva Gay Carter so that he could purchase a 32-unit apartment complex known as "Walnut Court" in what is known as the "Haughville" neighborhood of Indianapolis, Indiana.  As Mr. Dempsey described this property, it was a badly distressed tract, with about half of the rental units vacant, in a run down condition with significant repairs required for virtually all of the apartments.  Haughville has the unfortunate reputation as a high crime area and Mr. Dempsey describes the immediate environment at Walnut Court as being full of drugs, shootings, and some prostitution. He faced the difficult prospects of cleaning and fixing up the physical structures as well as improving the caliber of the tenants.  Up to this point in his life, Mr. Dempsey had made his living principally as a lawyer in a general litigation practice, not as a landlord or in property restoration.  (He may have had a few other rental properties but had never been involved in anything the magnitude of the Walnut Court project.)  The price of Walnut Court was to be $500,000.  Under the contract for sale, Dempsey was obligated to make monthly payments of $3,600, to pay all taxes and assessments, and to maintain fire and casualty insurance on the property.  One might wonder why Mr. Dempsey would undertake such a formidable venture with so little experience at such things.  Perhaps part of his motivation came from the fact that Walnut Court was just two doors away from his boyhood home.  Mr. Dempsey may have seen this property as

an opportunity to make a little money and to do more than a little good in improving a valued neighborhood which could certainly have used the help.

He threw himself personally into the Walnut Court project by performing the vast majority of the necessary labor himself, including painting, digging sewer lines, and acting as his own rental agent (at no small risk to himself, given the nature of some of the pre-existing tenants), financier, bookkeeper, and marketer.  Despite his near full-time commitment to the Walnut Court project, he attempted to maintain his law practice.

Unfortunately, although the cash flow at Walnut Court may have improved somewhat during Mr. Dempsey's stewardship, it did not improve to a sufficient degree or at a sufficient speed to fulfill his contract obligations to the Carters.  He also incurred other debts, many of which were related to improvements being attempted at Walnut Court.  Soon, Mr. Dempsey found himself in default on the contract with the Carters and seriously behind on other financial obligations.  As his contractual deficiency led to suit by the Carters, Mr. Dempsey then became his own number one law practice client, representing himself in a Marion County, Indiana Superior Court on the Carters' claim of breach of the Walnut Court contract.  That suit did not go well for Mr. Dempsey; the state court entered a judgment in favor of the Carters and against him in March of 2002. Mr. Dempsey has attempted to obtain relief from that judgment in the state trial and appellate courts with no success.  Eventually, Mr. Dempsey's troubles brought him to the Bankruptcy Court in this district, in which he filed a pro se voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on October 15, 2002.

He elected to continue his self representation throughout that bankruptcy proceeding (except for a brief period near the end of the pendency of the bankruptcy when he was represented by counsel).  All the while, Dempsey continued to pull the laboring oar at the Walnut Court project.  It is hard to imagine how he did it all, with the time consuming work at Walnut Court, physical and otherwise, as well as the very active litigation in the bankruptcy and in the state court contract/foreclosure matter, in addition to attempting to, at least occasionally, continue to practice law on behalf of clients other than himself.

Perhaps it was the pull of all of those activities, or perhaps it is simply Mr. Dempsey's ordinary style of practice, but many of his filings in the bankruptcy proceedings are difficult to understand and can fairly be described as unconventional. He uses a sort of "scattergun" approach, firing numerous ideas around in a rapid fashion, without developing any of them in a detailed manner that would be expected in legal argument.  It might also be described as a "broad brush" approach.  His arguments, both orally and in written form, fit best in the category of "stream of consciousness."  To someone not trained in the law, his presentations might resemble legal arguments.  To experienced lawyers and judges, his presentations require a tremendous amount of refinement and synthesizing to make them coherent.  A reading of just a few of his filings in the bankruptcy court will validate these observations.

Because the results in the bankruptcy—including several of the Bankruptcy Judge's actions during the bankruptcy—were not satisfactory to Mr. Dempsey, he undertook the appeals to this court.  Mr. Dempsey continued to represent himself in this

4

court (with one brief exception) and he has retained the same litigation style observed in the bankruptcy court.  This matter of style is mentioned only because the court has spent a great deal of time sorting through Mr. Dempsey's filings here to attempt to understand what issues he is actually raising on appeal.  As the Appellees correctly note, Mr. Dempsey has indicated that he was appealing various other issues which are not addressed in his appellate briefs.  He also makes some very broad comments in his arguments which imply that he is challenging virtually everything the Bankruptcy Judge did during the pendency of the bankruptcy.  He also has submitted virtually hundreds of documents from the bankruptcy as a part of the record, but he has not submitted transcripts of all of the hearings about which he complains, at least by casual allusion in his briefs.  Simply put, it was no easy task figuring out what Mr. Dempsey properly presents here on appeal.  In the end, though, by considering how Mr. Dempsey replied to the Appellees' restatement of the issues in their brief, it seems relatively clear that Mr. Dempsey's complaints about the bankruptcy are focused on four critical rulings.

Most importantly, Dempsey contends that the Bankruptcy Court erred in dismissing his Chapter 13 bankruptcy case, in finding that he could not devise a feasible plan, and in barring him from re-filing for one year from the dismissal.  The other three contested rulings were interim decisions during the pendency of the bankruptcy, namely: the decision by the Bankruptcy Judge to award or certify attorney fees in favor of the Carters in the amount of $81,716.80; the July 2, 2004 grant of a relief from stay and abandonment with respect to the Walnut Court property (thereby allowing the foreclosure sale of it), including the denial of a motion by Dempsey to reconsider that

5

order; and the denial of Dempsey's Motion for Relief as to Fees and Expenses under Bankruptcy Rule 9011 and the Federal Rules of Civil Procedure, including failing to set off against this amount the value of his own legal work on the bankruptcy.

The Carters responded to the consolidated appellate brief on June 22, 2005, and a reply was filed on August 4, 2005.  The appeal is therefore ripe for judicial determination and the court now rules as follows.

Both this court and the Bankruptcy Court have discussed the facts and procedural history of this case in written entries, and the parties should be quite familiar with them at this point.  Therefore, no additional background summation of the case is necessary and the court turns directly to the legal issues presented in Mr. Dempsey's appeal.

## II.    DISCUSSION

When a district court reviews a decision of a bankruptcy court, the district court acts as an appellate tribunal.  Therefore, its review is governed by traditional standards of appellate review.  Specifically, a district court must review conclusions of law made by a bankruptcy court de novo.  *In re Excalibur Auto Corp.*, 859 F.2d 454, 457 n.3 (7th Cir. 1988).  However, a district court "is constrained to accept the bankruptcy court's findings of facts unless they are clearly erroneous."  *Id*; *accord In re Fedpak Sys., Inc.*, 80 F.3d 207, 211 (7th Cir. 1996); *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir. 1988).  And where the challenged finding is a mixture of law and fact, the

clearly erroneous standard also applies.  *Graham v. Lennington*, 74 B.R. 963, 965 (S.D. Ind. 1987).

Decisions regarding an award of attorneys' fees are subject to the abuse of discretion standard.  *In re Kenneth Leventhal & Co.*, 19 F.3d 1174, 1177 (7th Cir. 1994). An abuse of discretion occurs in this context "if the bankruptcy judge fails to apply the proper legal standard, fails to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous."  *Agate Holdings, Inc. v. Ceresota Mill L.P. (In re Ceresota Mill L.P.)*, 211 B.R. 315, 317 (B.A.P. 8th Cir. 1997); *cf. INB Banking Co. v. Iron Peddlers, Inc.* 993 F.2d 1291, 1293 (7th Cir. 1993) ("Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court.").  The reasonableness of an attorneys' fee award is a finding of fact subject to the clearly erroneous standard*.  See In re Krueger*, Nos. 82-C-846, 82-C-847, 82-C-885, 82-C-886 & 82-C-903, 1983 WL 35486, at *2 (W.D. Wis. Jan 3, 1983).

A.      **The Bankruptcy Court Did Not Err in Awarding Appellees Their Reasonable Attorneys' Fees.**

On March 18, 2004, the Bankruptcy Court issued an entry in which it found the Carters to be oversecured creditors in Mr. Dempsey's bankruptcy case and awarded them their reasonable attorneys' fees incurred in litigating the case—$81,716.80.  (The Carters had requested fees totaling $108,955.73, for legal services performed by attorneys with the law firms of Krieg, Devault, Alexander and Capehart, LLP

7

and Thrasher Griffith & Voelkel.)  In its entry, the Bankruptcy Court directed Mr.

Dempsey to make a payment of $154,716.80 to the Carters (consisting of an arrearage

amount of $133,000 and partial attorneys' fees of $21,716.80) on or before June 30,

2004.  The Court also provided a schedule for the payment of the remaining attorneys'

fees.  This entry is the main focus of Mr. Dempsey's appeal.

11 U.S.C. § 506(b) provides for the allowance of fees (including attorneys' fees),

costs, and charges as part of an oversecured creditor's allowed secured claim, *In re

LHD Realty Corp.*, 726 F.2d 327, 333 (7th Cir. 1984), provided that the fees, costs, and

charges are reasonable and provided for under the agreement under which the

creditor's claim arose, *Mann v. Chase Manhattan Bank*, 316 F.3d 1, 5 (1st Cir. 2003).

To substantiate a claim for attorneys' fees under § 506(b), a creditor must satisfy four

requirements: 1) the creditor must have an allowed secured claim; 2) the claim must be

oversecured; 3) the underlying documents must provide for such fees; and 4) the fees

must be reasonable.  *In re Wire Cloth Prods., Inc.*, 130 B.R. 798, 814 (Bankr. N.D. Ill.

1991).

Mr. Dempsey does not appear to contest the Bankruptcy Court's application of

§ 506(b) to the facts presented here, or its finding that the Carters are oversecured

creditors as defined by 11 U.S.C. § 506(a) and *United States v. Ron Pair Enterprises,

Inc.*, 489 U.S. 235 (1989).  Instead, he disputes the attorneys' fees awarded.  He

contends that even if § 506 allows for the recovery of fees in Chapter 13 cases

generally, the Bankruptcy Court's award of fees was not appropriate because the

parties' September 3, 1999 contract for sale of Walnut Court (the "Land Sale Contract")

8

does not provide for such fees, and the fee award is unreasonable in light of the work performed.

In this case, the Land Sale Contract expressly provides for the Carters' recovery of attorneys' fees as a non-breaching party to the Contract.  Section 18 of the Contract, titled "Remedies; Attorneys' Fees," states:

> Vendor and purchaser agree and acknowledge that, in the event either party breaches this Contract, the non-breaching party shall be entitled to seek and obtain immediate and permanent injunctive relief and other equitable relief, including but not limited to . . . reasonable attorney's fees, costs and expenses . . . .

What is more important to this court, and clearly to Mr. Dempsey, is the reasonableness of the $81,716.80 award.

Reasonableness has two facets: 1) the fees must be reasonable; and 2) the creditor's actions must be reasonable.  *In re West Elecs., Inc.*, 158 B.R. 37, 40 (Bankr. D.N.J. 1993) (citing *In re Wire Cloth Prods.*, 130 B.R. at 814).  A court should look at whether the creditor's "fees and costs fall within the scope of the fee provision, whether the [creditor] took the kind of reasonable actions a similarly situated creditor would have taken, and whether such actions and fees were outside the range so as to be deemed unreasonable."  *Id.* at 41-42.  A court has broad discretion to determine what constitutes a reasonable fee.  *In re Mills*, 77 B.R. 413, 419 (Bankr. S.D.N.Y. 1987).  As stated by one court in this circuit,

9

> In exercising this discretion, courts have been wary of the potential for abuse of an oversecured creditor's right to attorneys' fees and costs.  As one often-quoted passage puts it, "[a] rule of reason must be observed in order to avoid [fee-shifting] clauses from becoming a tool for wasteful diversion of an estate at the hands of secured creditors, who, knowing that the state must foot the bills, fail to exercise restraint in enforcement expenses."

*In re Josephs*, 108 B.R. 654, 656 (Bankr. N.D. Ill. 1989) (citing *In re Mills*, 77 B.R. at 419-20).  Upon review of the evidence, this court finds, as the Bankruptcy Court concluded, that the amount of attorneys' fees requested by the Carters was, for the most part, reasonable and well-documented.[2]  And the Bankruptcy Court accounted for the unreasonable fees claimed, declining to issue a blanket fee award that incorporated the Carters' request in its entirety.  Instead, the Court reduced the requested fees by twenty-five percent, finding that the Carters unnecessarily had two attorneys working on some aspects of the case that required the attention of only one.  This court agrees that the Carters failed to demonstrate an adequate justification for utilizing two attorneys at some court hearings.  Furthermore, it appears that the Carters' counsel improperly billed a substantial amount of time for "strategy" conferences and telephone conversations unnecessarily attended by numerous counsel.  The Bankruptcy Court's one quarter reduction of fees accounted for those time-consuming and sometimes unnecessary strategy sessions as well.

---

[2]  The rates charged are both reasonable and within the range of fees charged by practitioners before this court and the bankruptcy court, and Mr. Dempsey does not explicitly challenge them in his appellate briefs.

The Carters' actions in litigating Mr. Dempsey's Chapter 13 bankruptcy proceeding were, for the most part, reasonable.  Mr. Dempsey is correct that his overall situation did not necessarily "call for a lot of litigating."  (Appellant's Br. 21.)  And it appears that the Carters at least tacitly agreed with this assessment, as there is nothing in the record that suggests they did anything to compound the bankruptcy litigation proceedings.  Instead, Mr. Dempsey's lack of experience in bankruptcy law, coupled with his apparent inability to pursue the proceedings with the appropriate amount of time and care, added to their complexity and length.  This is most clearly evidenced through Mr. Dempsey's failure to submit a confirmable plan.

To address Mr. Dempsey's main concerns more specifically:

**The August 3, 2003 motion to dismiss**.  It does not appear to this court that the Carters filed their August 3, 2003 motion to dismiss for any improper purpose, let alone to delay Mr. Dempsey from completing the repairs on Walnut Court.  Instead, it came as a result of Mr. Dempsey's inability to have a plan confirmed, despite several attempts to do so at that point.

**The insurance certification**.  Under the Land Sale Contract, Mr. Dempsey was required to provide a certain amount of insurance coverage for Walnut Court.  He did not do so, arguing that he was unable to secure a policy with less than $1,000,000 coverage.  This is not adequate grounds for failing to perform on the Contract.  Therefore, the Carters acted reasonably in seeking a judicial remedy to ensure that the Walnut Court property was insured.

11

**The November 19, 2004 motion to lift stay**.  As will be discussed in more detail in Section II.C. of this Entry, the Carters' motion to lift stay or for abandonment was well-grounded in law.  In addition, nothing in the record indicates it was filed for an improper purpose or to delay the bankruptcy proceedings.

**Plan objections**.  Mr. Dempsey filed eight different plans, none of which the Bankruptcy Court confirmed.  He asserts that, for various reasons, each plan was feasible.  However, this court finds that the Carters' objections to the plans (and the objections of other creditors, for that matter) were valid.  The objections articulated concerns that the plans did not set forth adequate payment schedules and were unclear.  These objections were well-taken by the Bankruptcy Court, and properly cited as partial reasons for its rejections of the plans.

Mr. Dempsey contends that he had little control over counsel's billing practices. (Appellant's Br. 18.)[3]  This is true.  However, Mr. Dempsey did have control over the

---

[3]  Mr. Dempsey also briefly complains that he could not "break out" the Carters' bills. (Appellant's Br. 18).  This court found the submission of the Carters' attorneys to be in a standard and easily understandable format.  So, apparently, did Judge Metz.  Judge Metz further explained what Mr. Dempsey did with his opportunity to question Carters' lawyers about these bills:

> A fair amount of time in the December 10th hearing was spent questioning Lehman about her "genius factor", her SAT scores and other "objective indicators" of her language skills. . . . The point is that a fair amount of court's and counsels' time was wasted on a line of inquiry that was not relevant, and this pattern has consistently surfaced with respect to other issues that have been argued in this case.

(Entry on Carter's Mot. for Determination of Secured Status, and Debtor's Pet. for Certification and Allocation of Fees and Expenses 6.)

nature of the proceedings of his bankruptcy case, and in this regard, he could have acted to limit the amount of work necessary by all parties.  Instead, from what appears to be his lack of experience in this specialized area of the law, Mr. Dempsey failed to move his case forward in an expeditious manner.  Indeed, he had been in bankruptcy for seventeen months without having presented a confirmable plan at the time the Bankruptcy Court entered the fee award.  Counsel's billing simply accounted for that situation.[4]

The Bankruptcy Court's entry on attorneys' fees did not include a line by line analysis of the attorneys' fees claimed by the Carters or the time billed by their counsel, as appears to be the practice of some other courts.  *See, e.g.*, *In re Lund,* 187 B.R. 245 (Bankr. N.D. Ill. 1995).  But the Seventh Circuit has endorsed similar lump sum reductions "as a practical means of trimming fat from a fee application; it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application." *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) (discussing lump sum reduction in number of hours claimed).  Further, it was not necessary for the Bankruptcy Court to elaborate how certain criteria affected its decision, and its failure to do so is no abuse of discretion.  *See id.* at 97 ("There is no one formula for determining a fee award . . . .").  The record on appeal indicates that the Bankruptcy Judge was well-acquainted with Mr.

---

[4] Judge Metz's entry also clarifies that for these reasons, Mr. Dempsey's is not an ordinary Chapter 13 Bankruptcy.  Mr. Dempsey has catalogued a small sample of awards to oversecured creditors, which he claims demonstrates that reasonable attorneys' fees should be less than ten percent of the debt to be collected.  This argument leads nowhere.  Judge Metz explained the extraordinary nature of this case and Mr. Dempsey's sampling in no way stands for the proposition that reasonableness should be gauged as a percentage of debt.

Dempsey's Chapter 13 litigation and counsel's billing practices, and did consider and assess all relevant information.  Indeed, the Court conducted four hearings and reviewed hundreds of pages of briefs and exhibits on the subject.  While the Bankruptcy Court's entry was not as detailed as it could have been, it summarized adequately the vast breadth of knowledge the Court gained through its oversight of Mr. Dempsey's Chapter 13 proceedings, and can stand on that basis alone.  *See, e.g.*, *In re Farwell*, 77 B.R. 198, 199 (N.D. Ill. 1987).

For these reasons, the Court affirms the Bankruptcy Court's decision to award the Carters their reasonable attorneys' fees in the amount of $81,716.80.

**B.      The Bankruptcy Court Did Not Err in Denying Appellant's Motion for Reconsideration of the Fee Award.**

In response to the award of fees by the Bankruptcy Court, Mr. Dempsey filed a Motion for Relief as to Fees and Expenses Under BR 9011, in which he requested that the Bankruptcy Court award him fees as a sanction for alleged inappropriate conduct on the part of the Carters' counsel.  The Bankruptcy Court denied the motion and also declined to issue sanctions, in part for the reasons discussed in Section II.A. of this Entry, *supra.*  Mr. Dempsey now suggests that the Bankruptcy Court's decision constituted error.

As discussed in detail in Section II.A., nothing in the record suggests that counsel for the Carters acted with improper purpose, or sought to delay or increase the cost of

Mr. Dempsey's bankruptcy proceedings.  It is not the case that the Carters "wrapped a litigation boa constrictor around [Mr. Dempsey] and bid [sic] their time," as he contends (Appellant's Br. 21); instead, they responded to his failure to pursue his case. Therefore, the Bankruptcy Court correctly denied Mr. Dempsey's Rule 9011 motion, and that ruling survives his appeal to this court.

**C.     The Bankruptcy Court Did Not Err in Granting Appellees Relief From the Stay.**

On July 2, 2004, the Bankruptcy Court lifted the automatic stay imposed by 11 U.S.C. § 362(a) and ordered Walnut Creek abandoned from Mr. Dempsey's bankruptcy estate.  In his appeal, Mr. Dempsey attempts to discredit the Court's basis for lifting the stay—that he had defaulted on his obligations under the Land Sale Contract and failed to abide by the Court's March 18, 2004 on attorneys' fees.  He contends that the Court improperly relied on false statements by the Carters that he failed to make monthly payments and did not pay property taxes owed on Walnut Creek, as the contract required.

Section 362(d) sets forth the grounds for relief from the stay.  It provides that a court "shall" grant relief, for example, by terminating, annulling, modifying or conditioning the stay "for cause, including the lack of adequate protection of an interest in property."  Lack of adequate protection of an interest in property is the most common basis for granting relief for cause.  Indeed, this is the basis upon which the Bankruptcy Court relied in lifting the stay here.

15

The Bankruptcy Court's dismissal of the underlying action likely mooted any disagreement regarding the lifting of the stay, *see In re Statistical Tabulating Corp., Inc.*, 60 F.3d 1286, 1290 (7th Cir. 1995), as this court has previously ruled (Doc. Nos. 31 & 32).  However, the Bankruptcy Court's decision would stand on the merits regardless. Mr. Dempsey had not satisfied his obligations under the Land Sale Contract for a period of several months.  On November 1, 2003, he failed to make a payment due to the Carters, and on November 10, 2003, he failed to pay real estate taxes due on Walnut Creek, which prompted the Carters' motion to lift the stay.  Mr. Dempsey continued his failure to make payments in January and February 2004.  In all, Mr. Dempsey owed the Carters an arrearage of approximately $133,000, as found by the Bankruptcy Court. Despite these breaches, the Bankruptcy Court did not lift the stay immediately, but instead allowed Mr. Dempsey a "reasonable time" to pay the amounts owing.

11 U.S.C. § 1322(b)(5) provides that a debtor may propose to cure any default within a "reasonable time" and to maintain payments during the pendency of the Chapter 13 case on any claim in which the last payment is due after the due date of the final payment under the plan.  "Reasonable time" is a flexible concept that is determined on case-by-case basis, and is within sound discretion of Bankruptcy Court.  *In re Steinacher*, 283 B.R. 768, 773 (B.A.P. 9th Cir. 2002).  Here, the Bankruptcy Court properly exercised this discretion to determine a reasonable time for a cure period.  In so doing, it conducted an extensive fact inquiry into Mr. Dempsey's ability to obtain assets to cure the arrearage.  While the Court recognized that Mr. Dempsey attempted to sell his Green Hills and Rex Court properties to pay the arrears, and credited him for

16

that attempt, the Court found that the sales were not timely completed.  Apparently Mr. Dempsey did not make an adequate showing of his attempts to sell the properties, or why the sales did not occur more quickly.  Indeed, it appears that Mr. Dempsey finally sold the properties only as an immediate response to the Court's lifting of the automatic stay, rather than as an immediate response to the Court's earlier order to pay the arrears, which would have been the appropriate course of action.  The sales were closed sometime in August 2004, only a month after the Court had lifted the stay.

Mr. Dempsey's failure to pay the arrearage owed for his obligations under the Land Sale Contract and the attorneys' fees awarded by the Bankruptcy Court, coupled with his lack of substantive response to the Court's order to cure within a reasonable time, after given several opportunities to do so, formed adequate cause for the Bankruptcy Court to lift the automatic stay imposed by § 362(a).  Therefore, this court declines to disturb the Bankruptcy Court's decision on that issue.

**D.     The Bankruptcy Court Did Not Err in Dismissing the Bankruptcy Case and Barring Appellant From Re-Filing the Case for One Year.**

Finally, Mr. Dempsey contends that on November 12, 2004 the Bankruptcy Court improperly dismissed his case and barred him from re-filing it for a period of one year. He suggests that the Bankruptcy Court misperceived an inability on his part to devise a

confirmable plan, and that its decision to bar re-filing for one year was an "extraordinary measure" (Appellant's Br. 15) not warranted here.

A court may dismiss a Chapter 13 case if the debtor has been guilty of unreasonable delay prejudicial to the interests of creditors.  11 U.S.C. § 1307(c)(1).  For example, in *Howard v. Lexington Investments, Inc.*, 284 F.3d 320 (1st Cir. 2002), the First Circuit affirmed the dismissal of a case in which the debtor, even having been granted extensions of time by the court, had failed to comply with a court order that he file tax returns necessary to compute taxing authorities' proofs of claim, without which a plan could not be confirmed.  Unreasonable delay in the filing of necessary modifications of a plan, in obtaining necessary acceptances from the holders of allowed secured claims, or in taking actions required under the plan are other examples of delays warranting dismissal.  *See, e.g.*, *In re Blaise*, 219 B.R. 946 (B.A.P. 2d Cir. 1998) (debtor did not deny that plan was fraught with problems and he had made no efforts to market property that was to be sold under plan).  The denial of confirmation of an original or modified plan, coupled with a final refusal by the court to grant further time for filing another plan or modifications, also will result in dismissal of a Chapter 13 case. *Badalyan v. Holub (In re Badalyan)*, 236 B.R. 633 (B.A.P. 6th 1999).

Based on Mr. Dempsey's conduct, no reasonable person could disagree with the Bankruptcy Court's decision to dismiss his case.  Mr. Dempsey's conduct ranged from filing untimely and irrelevant responses to failing to follow the Bankruptcy Court's orders to neglecting to file a suitable plan.  Indeed, throughout the course of the case, Mr. Dempsey filed eight proposed plans, each of which the Bankruptcy Court declined to

18

confirm for various reasons.  The Court declined to confirm the most recent plan because, it concluded, the income Mr. Dempsey was receiving from the Walnut Court rentals was insufficient to fund the plan, and excessive income was speculative and insufficient to further fund the plan to successful completion.  Mr. Dempsey's handling of the case, while not in bad faith, demonstrated his inability and lack of knowledge to pursue the case with the appropriate care.  And it made it nearly impossible for the case to be successfully completed.  The Bankruptcy Court properly so concluded, and after allowing Mr. Dempsey fair opportunity to defend his conduct, dismissed the case.  This court is not convinced, based on its own review of Mr. Dempsey's failed attempts to move the bankruptcy proceeding forward, that this constituted error on the part of the Bankruptcy Court.  *See Badalyan*, 236 B.R. at 638 (bankruptcy court properly dismissed Chapter 13 case for cause pursuant to 11 U.S.C. § 1307(c) where court found debtor's failure to file plan conforming to requirements of 11 U.S.C. § 1325 and failure to amend plan constituted prejudicial delay to creditors).

As to the one-year bar on re-filing the case, it appears to have been justified. Where it is found that a debtor prejudicially delayed a Chapter 13 bankruptcy proceeding, dismissal of the case is appropriate with a bar to refiling subsequent bankruptcies for a reasonable period of time under the provisions of 11 U.S.C. §§ 105, 109 and 349.  *See, e.g.*, *In re Earl*, 140 B.R. 728, 741 (Bankr. N.D. Ind. 1992).  Under these provisions, "the Court may dismiss a case with prejudice to refiling for an appropriate period of time."  *In re Ericson*, No. 03-83019, 2004 WL 758175 at * 4

(Bankr. C.D. Ill. Apr. 6, 2004).  This may be for a period of 180 days or longer, should the Court deem it necessary.  *Id.*

As stated above, Mr. Dempsey failed on numerous fronts to adequately assure that his bankruptcy proceeding moved forward in a manner that protected both his and his creditors' interests.  The Bankruptcy Court found that any refiling of the case simply would be for the improper purpose of delaying the sheriff's sale of Walnut Court.  The Court's reliance on these and other facts in dismissing Mr. Dempsey's case was appropriate, and applies equally to its imposition of the one-year bar to re-filing of the case.  *See, e.g.*, *In re Earl*, 140 B.R. at 741 ("The Court must preserve the integrity of the Bankruptcy system and prevent the abusive use of the Bankruptcy system invoked only to thwart the legitimate rights of creditors, and preclude an unwarranted congestion of its docket by enjoining the Debtor from again filing another chapter 13 case in the near future.").  Thus, the court declines to overrule the Bankruptcy Court's ruling on either point.[5]

## III.   CONCLUSION

Mr. Dempsey's dismissed Chapter 13 bankruptcy case undoubtedly resulted from an unfortunate chain of events, and led to an award of substantial attorneys' fees against him.  With this no party can disagree.  While it may be unfortunate that the case

---

[5]  While Mr. Dempsey appears to raise additional appellate issues in his Motion for Leave to Appeal, he does not directly or significantly address these issues in his briefs before this court.  Therefore, any additional appellate issues are waived, *see Luellen v. City of East Chicago*, 350 F.3d 604, 609 (7th Cir. 2000), and the court declines to address them.

20

ended the way it did, this court cannot be guided by sympathy alone—it must be guided

by the law.  And at all times the Bankruptcy Court acted within the bounds of the law.

For this and the reasons stated above, the court affirms the decision of the Bankruptcy

Court for the Southern District of Indiana granting Appellees George C. Carter and

Oleva Gay Carter relief from the stay in Appellant George B. Dempsey's Chapter 13

bankruptcy case and subsequently dismissing the case and barring Mr. Dempsey from

re-filing it for a period of one year.  The court also affirms the Bankruptcy Court's

decision to award the Carters their reasonable attorneys' fees in the amount of

$81,716.80.  Judgment shall enter in favor of the Appellees.


        ALL OF WHICH IS ENTERED this 8th day of December 2006.


                                    _____
                                      John Daniel Tinder, Judge
                                     United States District Court

Copy to:

Gordon B. Dempsey
P.O. Box 22542
Indianapolis, IN 46222
gdempseypc@aol.com


Electronic Copies to:

Alicia Mitchell Chandler
Krieg DeVault
achandler@kdlegal.com

Matthew A. Griffith
Thrasher Griffith & Voelkel
griffith@indiana-attorneys.com

Martha R. Lehman
Krieg DeVault, LLP
mlehman@kdlegal.com

Marion Gibson Miller
mollym@bobbrothersch13.com